***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner.
 *********** ORDER
On January 6, 2005, Plaintiff filed a letter with the Full Commission stating the following:
 I did not receive a copy of the aforementioned Opinion and Award until January 6, 2005. I was alerted to the fact that an Opinion and Award had been filed when I received a check from the adjuster which apparently represented the amount to which my client was entitled under Mr. Deluca's decision. I attempted to contact Mr. Deluca's office for a copy of the Opinion and Award today, but I was unable to talk to his assistant and I left a message on her voice mail to please provide me with a copy of the decision. In the meantime I contacted the office of Sandra King, Attorney for Defendants, and her assistant faxed to me a copy of the decision, absent the cover page, and perhaps, an additional page of the Opinion and Award. I later discussed this matter with Mr. Deluca and I trust that I will receive a copy of the Opinion and Award from him. At any rate, please note my notice of appeal. I am also filing a motion with the Full Commission to consider this appeal as being timely filed.
On July 5, 2005, Defendants filed a motion to dismiss the appeal pursuant to N.C. Gen. Stat. § 97-85, as being untimely filed.
Based on a review of the record and arguments by the parties, the Full Commission finds that Plaintiff gave timely notice of appeal after receipt of the Opinion and Award of the Deputy Commissioner and Plaintiff's motion to consider this appeal as being timely filed is GRANTED. Defendants' motion to dismiss the appeal pursuant to N.C. Gen. Stat. § 97-85, as being untimely filed is DENIED.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. It is stipulated that all parties are properly before the Industrial Commission, and that the Employee contends that she suffered compensable injuries by accident arising out of and in the course of her employment with Defendant-Employer on March 15, 2000, at approximately 10:00 p.m.; and the Employee also suffered compensable injuries arising out of and in the course of her employment with Defendant-Employer on January 15, 2001, at approximately 11:15 p.m.
2. It is stipulated that Defendant-Employer is insured and its workers' compensation coverage is with Zurich American Insurance Company with respect to the aforementioned claims.
3. It is stipulated that there is no question as to the misjoinder or nonjoinder of the parties, and that the parties are properly before the Industrial Commission regarding the issues hereinafter set forth.
4. The Employee's average weekly wage is $529.02, yielding a compensation rate of $352.68, for the injury of March 15, 2000, and $481.06, yielding a compensation rate of $320.71, for the injury of January 15, 2001.
5. The issues to be addressed before the Industrial Commission are:
 (A) Whether or not Employee suffered injuries by accident arising out of and in the course of her employment with Defendant-Employer on or about March 15, 2000?
 (B) If so to what compensation benefits are Employee entitled as a result of said injuries?
 (C) Whether or not Employee suffered injuries by accident arising out of and in the course of her employment with Defendant-Employer on or about January 15, 2001.
 (D) If so to what compensation benefits is Employee entitled as a result of said injuries?
7. The Employee contends that she is entitled to weekly compensation benefits for temporary total disability and permanent partial disability or permanent total disability as a result of her compensable injuries. She also contends that she is entitled to medical benefits for her compensable injuries pursuant to N.C. Gen. Stat. § 97-25.
 ***********
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on September 9, 1945. She graduated from high school and completed a six-month course in cosmetology. Prior to November 1987, Plaintiff had worked in manufacturing, a convenience store, and in cosmetology.
2. Plaintiff went to work for Defendant-Employer in November 1987. During the first ten years of employment, she worked first in the cassette department and then in the kitting department. In the kitting department, Plaintiff assembled products on an assembly line. In 1997, she moved to the warehouse, where she worked in inventory control. In that job, she had to lift boxes ranging up to seventy-five pounds in weight. Much of her time was spent operating a standing forklift, also known as a picker.
3. On March 15, 2000, Plaintiff was operating the picker when it hit some trash in the aisle, bounced, and hit a beam. Plaintiff was thrown off balance and struck her left shoulder and side on the cage that enclosed the picker. She felt immediate shoulder pain. Plaintiff reported the incident to Defendant-Employer.
4. Plaintiff reported for work on the following day but was still in pain. Defendant-Employer sent her to Sisters of Mercy Urgent Care, where she went complaining of neck and shoulder pain. She was diagnosed with a contusion of the left shoulder and a strain of the left trapezius. Medications were prescribed, and she was returned to work without restriction.
5. As Plaintiff's shoulder and neck pain persisted, she returned to Sisters of Mercy Urgent Care on May 16, 2000. Thereupon, she was referred to Dr. James Thompson, an orthopedist.
6. Plaintiff saw Dr. Thompson on May 23, 2000, with chief complaints of pain and decreased range of motion in her left shoulder. She reported to Dr. Thompson that she had been suffering from neck pain since the previous December or January and from tightness and thickness of the trapezius since the previous February. An examination revealed mild subacromial crepitation and tightness in the left trapezius. She had full range of motion. Dr. Thompson diagnosed Plaintiff with probable cervical radiculopathy, made worse by her injury at work.
7. In June 2000, Plaintiff treated for her neck and shoulder pain with Dr. Paul Monitto, her chiropractor. Effective June 8, 2000, Dr. Monitto took Plaintiff out of work due to her symptoms.
8. Upon referral by Dr. Thompson, Plaintiff saw Dr. Richard Weiss, a neurosurgeon, on June 29, 2000, who is in the same practice with Dr. Ralph Loomis, also a neurosurgeon. Plaintiff's main complaint was left shoulder pain. Dr. Thompson wanted a determination on whether Plaintiff had a pinched nerve in her neck. Dr. Weiss instructed Plaintiff to remain out of work and ordered a cervical MRI scan which was done on July 1, 2000. Thereafter, Dr. Weiss retired. Plaintiff saw Dr. Loomis on July 20, 2000. Her main complaints were severe left shoulder pain and left-sided neck pain. Dr. Loomis kept Plaintiff out of work and recommended physical therapy. Based on his review of the cervical MRI, Dr. Loomis determined Plaintiff had bony spurring on the right and left sides between the fourth and fifth cervical vertebra and pinching of the C5 nerve root on both sides. A subsequent cervical myelogram revealed that Plaintiff also had pinching of the C6 nerve root on the left side.
9. By November 9, 2000, Plaintiff's symptoms had improved and her numbness was intermittent, rather than constant. Dr. Loomis released Plaintiff to return to work at her request, effective November 20, 2000, but cautioned her that the C6 nerve root impingement would likely remain the same.
10. The Full Commission finds as fact the information Plaintiff presented to Dr. Loomis in Plaintiff's hypothetical question found on deposition pages 12 and 13. Dr. Loomis was of the opinion that the work-related incident that Plaintiff experienced on March 15, 2000 could have or might have aggravated the condition which was present and for which he treated Plaintiff. He further opined that Plaintiff's work-related accident could have or might have resulted in her inability to work during the time he treated Plaintiff and excused her from work. Dr. Loomis's opinions were stated using "could have or might have" language because of the manner in which he was asked to give his opinion and did not reflect any speculation or equivocation on his part. Dr. Loomis specializes in neurological surgery and the Full Commission give great weight to his opinions.
11. On March 15, 2000, Plaintiff sustained an injury by accident arising out of and in the course of employment when the picker she was operating struck a steel I-beam support and threw her into the cage of the picker causing her to strike her left shoulder and left side on the cage. Plaintiff felt immediate pain in her left shoulder and the left side of her neck for which she sought medical treatment beginning the following day. Plaintiff's testimony on how her injury occurred, her resulting symptoms and her resulting disability is found to be credible.
12. Plaintiff's injury by accident on March 15, 2000 aggravated her prior condition of bony spurring on the right and left sides between the fourth and fifth cervical vertebra and pinching of the nerve root at C5 and C6.
13. As a result of her injury by accident on March 15, 2000, Plaintiff was removed from work by Dr. Weiss, Dr. Monitto and Dr. Loomis and was unable to work from June 8, 2000 through November 20, 2000. Plaintiff is entitled to temporary total disability at the rate of $352.68 for the period from June 8, 2000 through November 20, 2000.
14. Plaintiff returned to work with Defendant-Employer on November 20, 2000, after being released by Dr. Loomis. She continued to work in the warehouse and to operate a picker. On January 15, 2001, Plaintiff was operating the picker when one the pallets she was carrying on the picker got caught in a rack. The impact pushed the pallets onto Plaintiff, pinning her legs. A fellow employee heard her screaming and attempted to free her, but was unsuccessful. He then obtained help from another employee and Plaintiff's supervisor and they were able to free her. As a result of the impact of the pallets, Plaintiff's right leg was pinned against a metal scale and turned outward. Her left leg and left kneecap were forced into the metal housing of the picker. The right leg had a large hematoma, which left an indentation on the thigh. Her left kneecap struck the housing of the picker resulting in a direct injury of her knee.
15. As a result of this incident, Plaintiff experienced continuing pain in both legs. She returned to work on January 16, 2001, but had to leave work early due to pain and swelling of her legs. Defendant-Employer referred Plaintiff to an urgent care center, ProMed Asheville, due to these continued problems. On January 17, 2001, Plaintiff saw Dr. Regan Sheely at ProMed. Dr. Sheely recorded Plaintiff's history as follows:
 Presents secondary to an injury at [Defendant-Employer] that happened two days ago. She got her bilateral extremities trapped between a pallet jack. Her chief complaint is the pain in her right anterior thigh as well as her right calf and her left knee is giving her problems with her movements and she has left work secondary to the pain. Has no history of lower extremity problems.
16. Dr. Sheely's diagnosis was knee sprain, left knee strain, right hematoma, and left hematoma. He recommended warm compresses and placed Plaintiff on limited-duty work. He instructed her to return for a re-evaluation in one week. He restricted Plaintiff to walking no more than 50% of the workday, no bending, no stooping, and no lifting in excess of ten pounds.
17. Plaintiff kept her follow-up appointment with ProMed Asheville on January 23, 2001, and saw Dr. David Ward. His assessment was left knee sprain, and strain with contusions of the lower extremities. Dr. Ward continued Plaintiff's limited-duty status pending follow-up on January 30, 2001.
18. Plaintiff returned to ProMed Asheville on January 30, 2001, where Dr. Ward saw her again. He recorded that she was still having leg pain at the end of each day and by the end of the workweek she had become quite uncomfortable. Her left leg was the most bothersome but she had pain and stiffness in both legs. Dr. Ward continued her anti-inflammatory medication and limited-duty work status. He scheduled a return appointment for her on February 13, 2001.
19. On February 13, 2001, Plaintiff saw Dr. H.L. Clinton, Jr., who noted that her condition was improving gradually, but as she increased her walking at work, the pain and stiffness of the left knee and right calf increased. He prescribed ice and heat, gave her a sample of Vioxx and continued her work restrictions.
20. On February 23, 2001, Plaintiff returned to ProMed Asheville and saw Dr. Ward. He noted that she still had burning sensation in the posterior calves and left knee. He recommended Vioxx.
21. By March 5, 2001, Plaintiff had resumed her normal duties at work, but Dr. Ward noted that with weekend walking she experienced a lot of cramping. He prescribed physical therapy in an attempt to restore normal functioning. He also continued her regular-duty work status.
22. Plaintiff again saw Dr. Clinton on March 15, 2001, and had had one physical therapy session by that date. Plaintiff continued to suffer with pain in her left calf with extended walking. He recommended that she continue physical therapy and regular-duty work.
23. On March 23, 2001, Plaintiff reported to Dr. Clinton that she was tolerating work, but standing and walking for more than several hours caused increased pain in her left knee and proximal calf. He recommended home exercise.
24. Plaintiff followed up with ProMed Asheville on April 21, 2001, May 21, 2001, June 11, 2001, June 25, 2001 and August 24, 2001, for lower extremity problems. On April 21, 2002, Dr. Clinton referred Plaintiff to Dr. Charles DePaolo, an orthopedist, due to her unresolved injuries.
25. Dr. DePaolo saw Plaintiff on May 9, 2001, for bi-lateral lower extremity pain. He recorded that a wooden pallet had caught her legs on January 15, 2001. He noted that she had continued to work but was continuing to have residual pain and weakness of the lower extremities with her major problem being left knee joint problems. Upon examination, Dr. DePaolo diagnosed Plaintiff with a contusion of the right thigh and left knee, bursitis in the left knee, and a right ACL strain and he restricted her from full-duty work. Dr. DePaolo recommended physical therapy for strengthening and prescribed Mobic for inflammation and pain. He continued her full-duty restrictions. Dr. DePaolo also recommended that Plaintiff see Dr. Michael Douglas of Asheville Cardiovascular Thoracic Surgeons, P.A. to determine whether Plaintiff had suffered a vascular injury from compression of vessels from her accident.
26. On May 30, 2001, Plaintiff was evaluated by Charlie Robbins, a physical therapist, for her continuing knee problems. Mr. Robbins noted that her pain level varies from three to seven on a scale of ten. He also recorded that Plaintiff has more pain after being on her legs all day, with prolonged walking, and with prolonged sitting has pain in her knee upon rising, and muscle spasms. Mr. Robbins related these leg problems to the accident that Plaintiff experienced on January 15, 2001. Mr. Robbins initiated a physical therapy plan during which Plaintiff would receive treatment twice a week for four weeks.
27. Plaintiff's initial physical therapy program was completed on June 28, 2001, and it was noted at the time that her function was not improved and that her gait was still limited due to pain. Dr. DePaolo recommended a second program of physical therapy for Plaintiff's legs.
28. Therapy notes of June 26, 2001, revealed that Plaintiff was continuing to have pain in both legs and pain in the knee. She informed the therapist that she was "not much better." The assessment of the therapist was that she had "not improved." On June 28, 2001, the therapist noted, "[s]till with pain during prolonged walking; severe at times." The second program of physical therapy was stopped at this point because Defendants had not approved the treatment.
29. On or about August 6, 2001, Plaintiff was involved in a motor vehicle accident. The primary injuries for which she was treated as a result of this accident were whiplash and shoulder injuries.
30. On August 20, 2001, Plaintiff was still having significant problems with her legs after completing physical therapy. Dr. DePaolo recommended additional physical therapy, however, Defendants did not authorize this treatment. On August 20, 2001, Dr. DePaolo released Plaintiff at maximum medical improvement with no work restrictions and a .5% permanent partial impairment rating to both legs.
31. Plaintiff consulted with Dr. Donald Mullis, an orthopedic surgeon, on July 19, 2002, and reported continuing left knee pain, left leg pain and some locking in her knee. Upon examination, Dr. Mullis suspected an injury to Plaintiff's medial meniscus and calf area as a result of her work-related injury. Dr. Mullis took Plaintiff out of work at that time.
32. Following an MRI, Dr. Mullis saw Plaintiff on July 31, 2002, and determined that Plaintiff might have a tear of the medial meniscus in her left knee.
33. On August 6, 2002, Dr. Mullis performed surgery on Plaintiff, in which he repaired a tear of Plaintiff's medial and lateral meniscus. He also repaired problems related to her patella femoral articulation site and some cartilage damage.
34. Plaintiff then started physical therapy. However, as she was continuing to have problems with her left knee, Dr. Mullis performed follow-up surgery on December 12, 2002, because due to the amount of injury to her cartilage, Plaintiff's thighbone did not heal and additional surgery was required.
35. In the months that followed Plaintiff's second surgery, Plaintiff continued to treat with Dr. Mullis and had additional physical therapy to strengthen her knee. The process was very painful, so Plaintiff was placed on strong pain medication.
36. In October 2002, Plaintiff reported she was not doing well and that she had fallen on her left knee. Dr. Mullis was of the opinion that her problems at the time were related to her original injury of January 15, 2001, and not the fall. Plaintiff was still in therapy. Over the next several months, Plaintiff continued to report some problems with clicking and popping in her left knee but she improved. By February 2003, Plaintiff was reporting some back pain and sciatic-type pain in her left leg. Dr. Mullis scheduled an MRI, which showed an L5-S1 disc problem and some degenerative changes at L4-5 and L5-S1. Dr. Mullis recommended epidural steroid injections. Plaintiff's low back problems were pre-existing and Dr. Mullis had not completed his evaluation of her back as of the date of his deposition. The Full Commission is making no findings on whether Plaintiff's low back condition is related to her injury.
37. Dr. Mullis last saw Plaintiff on June 12, 2003. At that time Plaintiff's knee was doing much better. She had reached maximum medical improvement with respect to the left knee injury. He gave her a 15% permanent partial impairment rating to the left leg. He expected Plaintiff to have long-term clicking, popping and discomfort in her left leg. Dr. Mullis did not believe that Plaintiff could return to her old job with Defendant-Employer.
38. Dr. Mullis was of the opinion that Plaintiff's accident at work on January 15, 2001, could have or might have caused the injuries for which he treated Plaintiff and subsequently performed two surgeries to repair the meniscus tear and the chondromalacia. He further opined that the surgery was reasonably necessary to effect a cure or reduce her symptoms. The Full Commission gives great weight to the opinions of Dr. Mullis and finds that his opinions are not speculative.
39. Dr. Mullis opined and the Full Commission finds as fact that as a result of Plaintiff's left knee injury she was incapable of working for Defendant-Employer during the time she was undergoing treatment with Dr. Mullis from July 19, 2002 through June 12, 2003. After reaching maximum medical improvement on June 12, 2003, Plaintiff remained incapable of returning to the type of work she did in her pre-injury job with Defendant-Employer, because her knee was not able to tolerate the standing, squatting and lifting requirements of the job. She was capable, however, of working in less strenuous jobs that did not involve standing, squatting and lifting fifty pounds. Dr. Mullis stated he would like to review a description of any future jobs proposed for Plaintiff.
40. On January 15, 2001, Plaintiff suffered a compensable injury by accident arising out of and in the course of her employment when the picker she was operating hit some racks and pushed the pallets she was carrying forward onto Plaintiff, trapping her legs against the front of the picker cage.
41. Plaintiff's injury by accident on January 15, 2001, caused the injuries to her legs and knee for which she received treatment from various medical providers and resulted in the need for two surgeries to repair her meniscus tear and the chondromalacia. Plaintiff's testimony on how her injury occurred and her resulting symptoms and disability is found to be credible.
42. Dr. Mullis's treatment of Plaintiff including the surgeries he performed was causally related to her workplace injuries and was reasonably required to effect a cure, provide relief and lessen her disability, and Dr. Mullis should be authorized as Plaintiff's treating physician.
43. The medical treatment Plaintiff received for her two compensable injuries was causally related to her workplace injuries and was reasonably required to effect a cure, provide relief and lessen her disability.
44. As a result of her January 15, 2001 compensable injury, Plaintiff is entitled to temporary total disability compensation at the rate of $320.71 per week from July 19, 2002 through June 12, 2003.
45. Dr. Mullis was deposed on June 25, 2003, and the hearing in this matter was conducted on April 24, 2003. Therefore, the Full Commission is unable to determine Plaintiff's disability after she reached maximum medical improvement and this issue should be reserved.
46. Plaintiff's average weekly wage is $529.02, yielding a compensation rate of $352.68, for the injury of March 15, 2000, and $481.06, yielding a compensation rate of $320.71, for the injury of January 15, 2001.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. On March 15, 2000, Plaintiff suffered a compensable injury by accident arising out of and in the course of her employment when the picker she was operating hit a steel beam throwing Plaintiff off balance and causing her to strike her left shoulder and left side on the picker cage. Plaintiff's injury caused left shoulder pain and aggravated her pre-existing neck condition. N.C. Gen. Stat. § 97-2(6).
2. On January 15, 2001, Plaintiff suffered a compensable injury by accident arising out of and in the course of her employment when the picker she was operating hit some racks, which pushed the pallets she was carrying forward onto Plaintiff, trapping her legs against the front of the picker cage. Plaintiff's accident caused injury to her legs and knee and required two surgeries to repair her resulting meniscus tear and chondromalacia. N.C. Gen. Stat. § 97-2(6).
3. A Plaintiff in a workers' compensation case has the burden of initially proving "each and every element of compensability," including a causal relationship between the injury and her employment.Whitfield v. Lab. Corp. of Amer., 158 N.C. App. 341, 350,581 S.E.2d 778, 784 (2003). "The quantum and quality of the evidence required to establish prima facie the causal relationship will of course vary with the complexity of the injury itself." Hodgin v.Hodgin, 159 N.C. App. 635, 639, 583 S.E.2d 362,365 (2003). A Plaintiff must prove causation by a "greater weight" of the evidence. Phillips v. U.S. Air, Inc.,120 N.C. App. 538, 541, 463 S.E.2d 259, 261 (1995). The North Carolina Supreme Court has also held that in cases involving complicated medical questions, only an expert can give competent opinion testimony as to the issue of causation. Click v. Pilot Freight Carriers, 300 N.C. 164,167, 265 S.E.2d 389, 391 (1980). Where medical opinion testimony is required, "medical certainty is not required, [but] an expert's `speculation' is insufficient to establish causation." Holley v. ACTS,Inc., 357 N.C. 228, 234, 581 S.E.2d 750, 754 (2003). Furthermore, the causal relationship must be established by evidence "such as to take the case out of the realm of conjecture and remote possibility." Holley,357 N.C. at 232, 581 S.E.2d at 753.
It is permissible for the Industrial Commission to "infer causation where a medical expert offers a qualified opinion as to causation, along with an accepted medical explanation as to how such a condition occurs, and where there is additional evidence tending to establish a causal nexus." Adams v. Metals USA, 168 N.C. App. 469, 476, 608 S.E.2d 357,362, aff'd by 360 N.C. 54, 619 S.E.2d 495 (2005) (citing Johnson v.Piggly Wiggly of Pinetops, Inc., 156 N.C. App. 42, 52, 575 S.E.2d 797,804 (2003)).
"[Our Supreme] Court has allowed `could' or `might' expert testimony as probative and competent evidence to prove causation." Young v.Hickory Bus. Furniture, 353 N.C. 227, 233, 538 S.E.2d 912, 916 (2000). However, "`could' or `might' expert testimony [is] insufficient to support a causal connection when there is additional evidence or testimony showing the expert's opinion to be a guess or mere speculation." Id. (citing Maharias v. Weathers Bros. Moving StorageCo., 257 N.C. 767, 767-68, 127 S.E.2d 548, 549 (1962)).
In the instant case, Dr. Loomis was of the opinion that the work-related incident that Plaintiff experienced on March 15, 2000, could have or might have aggravated the condition which was present and for which he treated Plaintiff. He further opined that Plaintiff's work-related accident could have or might have resulted in her inability to work during the time he treated Plaintiff and excused her from work. Dr. Loomis's opinions were stated using "could have or might have" language because of the manner in which he was asked to state his opinion and the Full Commission has found herein that his choice of language did not reflect any speculation or equivocation on his part. Dr. Loomis's opinion testimony is supported by his independent medical examinations and diagnostic tests. Plaintiff's testimony on how her injury occurred and her resulting symptoms also supports Dr. Loomis's opinion testimony.
Although his opinions were expressed in "could have or might have" language, Dr. Mullis also gave sufficient grounds based on his examinations and test results to take his opinion testimony concerning Plaintiff's January 15, 2001 injury out of the realm of speculation. Likewise, Plaintiff's testimony about her problems with her legs after her January 15, 2001 injury by accident also supports Dr. Mullis's opinion testimony.
4. In order to receive disability compensation, the employee has the burden of proving the existence of that disability and its extent.Perkins v. U.S. Airways, ___ N.C. App. ___, 628 S.E.2d 402 (2006). The burden may be met in one of four ways: (1) the production of medical evidence that she is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that she is capable of some work, but that she has, after a reasonable effort on her part, been unsuccessful in her effort to obtain employment; (3) the production of evidence that she is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that she has obtained other employment at a wage less than that earned prior to the injury.Russell v. Lowes Product Distribution, 108 N.C. App. 762, 765,425 S.E.2d 454, 457 (1993). In the instant case, as a result of her injury by accident on March 15, 2000, Plaintiff was removed from work by Dr. Weiss, Dr. Monitto and Dr. Loomis and was unable to work from June 8, 2000 through November 20, 2000. With respect to her compensable injury of January 15, 2001, Dr. Mullis took Plaintiff out of work beginning July 19, 2002. Thereafter, Plaintiff underwent two surgeries and a course of physical therapy and did not reach maximum medical improvement until June 12, 2003. As of June 12, 2003, Dr. Mullis did not believe Plaintiff could return to her old job with Defendant-Employer; however, he opined that she was capable of working in less strenuous jobs. Plaintiff has proven that she was incapable of working from July 19, 2002 through June 12, 2003, when she reached maximum medical improvement. Dr. Mullis was deposed on June 25, 2003, and the hearing in this matter was conducted on April 24, 2003. The record closed before Plaintiff had an opportunity to prove whether she remained disabled from work after June 12, 2003. Therefore, the Full Commission is unable to determine Plaintiff's disability after she reached maximum medical improvement and this issue should be reserved for subsequent determination. N.C. Gen. Stat. § 97-29.
5. Plaintiff's average weekly wage on March 15, 2000 was $529.02, yielding a compensation rate of $352.68, for the injury of March 15, 2000; and $481.06 on January 15, 2001, yielding a compensation rate of $320.71, for the injury of January 15, 2001. N.C. Gen. Stat. § 97-2(5).
6. Plaintiff is entitled to temporary total disability compensation at the rate of $352.68 per week from June 8, 2000 through November 20, 2000. N.C. Gen. Stat. § 97-29.
7. Plaintiff is entitled to temporary total disability compensation at the rate of $320.71 per week from July 19, 2002 through June 12, 2003. N.C. Gen. Stat. § 97-29.
8. As a result of her compensable injuries, Plaintiff is entitled to payment for all reasonable medical expenses incurred or to be incurred as a result of her compensable injuries for so long as said treatment effects a cure, gives relief, or lessens Plaintiff's period of disability. N.C. Gen. Stat. § 97-25.
9. Dr. Mullis's treatment of Plaintiff, including the surgeries he performed was causally related to her workplace injuries and was reasonably required to effect a cure, provide relief and lessen her disability, and Dr. Mullis should be authorized as Plaintiff's treating physician. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee provided herein, Defendants shall pay to Plaintiff temporary total disability compensation at the rate of $352.68 per week from June 8, 2000 through November 20, 2000, and compensation at the rate of $320.71 per week from July 19, 2002 through June 12, 2003. These amounts have accrued and shall be paid to Plaintiff in a lump sum. Whether Plaintiff is entitled to continuing total, partial or permanent partial disability compensation after June 12, 2003 is reserved for subsequent determination.
2. Defendants shall pay all medical expenses incurred by Plaintiff as a result of her compensable injuries, when bills for the same have been submitted and approved according to procedures adopted by the Industrial Commission. With respect to Plaintiff's January 15, 2001 injury, Defendants shall pay for future medical treatment for so long as treatment is reasonably required to effect a cure, give relief and/or lessen Plaintiff's period of disability.
3. Dr. Mullis is authorized as Plaintiff's treating physician.
4. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due Plaintiff under Paragraph 1 of this AWARD is hereby approved for Plaintiff's counsel. Twenty-five percent (25%) of the compensation due Plaintiff shall be deducted from that sum and paid directly to Plaintiff's counsel.
5. Defendants shall pay the costs.
This the __ day of November 2006.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER